**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel Roman,<br><br>               Plaintiff,<br><br>v.<br><br>Berkshire Hathaway Homestate Insurance Co.,<br><br>               Defendant. | No. CV-15-02447-PHX-NVW<br><br>**ORDER** |

Before the Court is Defendant's Motion for Summary Judgment. (Doc. 55). For the following reasons, the Motion will be granted.

**I.    LEGAL STANDARD**

Summary judgment should be granted if the evidence reveals no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A material fact is one that might affect the outcome of the suit under the governing law, and a factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is the moving party's burden to show there are no genuine disputes of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Upon such a showing, however, the burden shifts to the non-moving party, who must then "set forth specific facts showing that there is a genuine issue for trial" without simply resting on the pleadings. *Anderson*, 477 U.S. at 256. To carry this burden, the non-moving party must

do more than simply show there is "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Id.* at 587.

## II. UNDISPUTED MATERIAL FACTS

Plaintiff Manuel Roman ("Roman") worked as a truck driver for Shipper's West Truckline, Inc. On September 3, 2013, he fell from the company truck as he exited the cab and suffered a head injury. A few days later, on September 7, 2013, Roman went to the emergency room at Wheaton Franciscan Healthcare ("Wheaton") in Wisconsin. At Wheaton, he was diagnosed with systolic hypertension and a concussion.

Roman next sought medical care on October 11, 2013, at Arrowhead Regional Medical Center ("Arrowhead") in California. At Arrowhead, a CT scan and examination revealed a subdural hematoma. Roman received a subdural drain to dispel blood and relieve pressure and was discharged on October 15, 2013. The discharge instructions noted that Roman should "Resume Normal Activity and Return to work" the next day. Roman returned to Arrowhead on October 31, 2013. The physician's notes from that appointment concluded: "Today the patient is doing well, with no symptoms, no complaints, including denies pain or any neurological deficit."

Roman filed a Worker's Report of Injury with the Industrial Commission of Arizona ("ICA") on or around November 8, 2013. In the report, Roman noted he suffered a "brain injury" described as a "blood clot in brain." The report also included contact information for Roman's employer and limited information about medical treatment Roman received.

Neither Roman nor his employer notified Berkshire Hathaway Homestate Insurance Co. ("Berkshire") of Roman's injury after the incident. Berkshire first learned of Roman's claim when it received a "Notification of Claim" from the ICA, dated November 14, 2013. The notification is a one-page document. It does not provide any contact information for Roman, specify the nature or extent of any injury, or indicate

whether Roman sought or received any medical treatment. Although the notification is dated November 14, 2013, the record does not reveal when Berkshire actually received it.

On November 22, 2013, Berkshire opened a claim file based on the notification, and by November 25, it had assigned an adjuster to handle the claim. The assignment directed the adjuster to "verify [Roman's] correct mailing address" and "obtain other missing info," explaining the file was set up based on limited information. It also stated that Berkshire unsuccessfully attempted to find Roman's address before assigning the file to the adjuster.

The adjuster began evaluating the claim on the same day he received it. His first contact was a phone call with the employer on November 25, 2013. The employer informed the adjuster that Roman had not reported an injury and that his final day with the company was on September 13, 2013. The adjuster called again two days later, on November 27, to request Roman's correct contact information, but was unable to reach the employer or leave a message. The adjuster called again on December 2 and emailed on December 4 to request Roman's correct contact information. Finally, on December 5, after obtaining Roman's phone number, the adjuster contacted Roman to discuss his claim. He described the conversation in his notes as follows:

> I was able to speak with [Roman], but he did not go into specifics of the claim or his injury. He informed me that he needs medical treatment and that he has suffered brain hemorrhaging. He also informed me that he did report the injury to his employer and that his injury is due to his employer's negligence. When I asked [Roman] to provide more information about the claim and injury, he indicated that he would prefer to have an attorney speak with me; [Roman] was not willing to continue the conversation. I provided my contact information and instructed [Roman] to have his attorney contact me as soon as possible."

That same day, the claims adjuster called the employer. The employer again informed him it "never received any report of injury from [Roman]" and that Roman drove an additional ten days after his injury.

Based on this preliminary investigation, the adjuster concluded he needed more information to determine the compensability of Roman's claim. He noted in the claims

- 3 -

diary: "As neither the claimant nor the employer were able to provide any information about the alleged injury, the compensability of said injury is in question." Accordingly, on December 6, 2013, Berkshire submitted a "Notice of Claim Status" to the ICA, which indicated Roman's claim was denied pending further investigation.

The claims adjuster called Roman again on December 6. In that call, he obtained more information about the incident and medical care Roman received, including phone numbers for both Wheaton and Arrowhead. He called both facilities that same day and requested Roman's medical records. The Wheaton records arrived on December 19, 2013, and indicated two diagnoses: systolic hypertension and a concussion. The records also showed a neurosurgeon reviewed the medical findings, including a CT scan, and concluded they were "not consistent with traumatic injury."

The adjuster made multiple efforts to procure the records from Arrowhead. He sent a faxed request for records, as Arrowhead required, on December 6. The request was not processed, however, and in a follow-up call with the hospital on January 3, 2014, the hospital required another faxed request. The adjuster sent another request that same day and then another on January 7, 2014. On January 17, 2014, he called Arrowhead to check on the request. The hospital said it was more than two weeks behind on processing such requests and suggested he call back the following week. He did so on January 24, 2014. In that call, Arrowhead confirmed it had processed the request and that the records would be mailed either that same day or the next business day. Berkshire received the Arrowhead records on January 30, 2014. The records indicated Roman suffered a subdural hematoma and received a subdural drain to dispel blood and relieve pressure. They made no finding of a concussion.

On February 3, 2014, within days of receiving and reviewing the Arrowhead records, the adjuster sought to schedule an independent medical examination ("IME"). The appointment was scheduled for February 27, 2014, with an independent neurologist, Dr. Leo Kahn. Dr. Kahn concluded, in a report received no earlier than March 3, 2014, that Roman's "subdural hematoma is directly related to the 09/03/13 industrial injury"

1 and that his treatment at Arrowhead was "in essence life-saving." Based on this report, Berkshire accepted Roman's claim on March 6, 2014. Berkshire has paid all of Roman's medical bills submitted to it for related medical treatment since that time.

Roman filed this action on December 2, 2015. The lawsuit alleges Berkshire breached its duty of good faith and fair dealing in handling Roman's workers' compensation claim and seeks compensatory and punitive damages. Berkshire moves for summary judgment on all claims.

**III. ANALYSIS**

Berkshire argues it is entitled to judgment as a matter of law on Roman's bad faith claim because (1) there is no evidence of a causal link between the alleged injury and Berkshire's "repeated delays" in processing Roman's claim and (2) Roman's claim was fairly debatable. Berkshire further argues (3) the evidence does not support a claim for punitive damages. Each argument is addressed in turn.

**A.  Proximate Causation**

"An insurer's bad faith handling of an insurance claim, like any other tort, is analyzed according to the principles of duty, breach, and proximately caused damages." *Michelman v. Lincoln Nat'l Life Ins. Co.*, 685 F.3d 887, 900 (9th Cir. 2012). "Proximate cause is found where, without any intervening cause and without the defendant's act, the injury would not have occurred." *Ferguson v. Cash, Sullivan & Cross Ins. Agency, Inc.*, 171 Ariz. 381, 386, 831 P.2d 380, 385 (App. 1991).

Roman alleges Berkshire's "repeated delays" in processing his claim resulted in compensable injury. But Roman was injured on September 3, 2013, and Berkshire had no notice of his claim until receiving the "Notification of Claim," dated November 14, 2013, from the ICA. Thus, the relevant period for which Berkshire may be liable for any aggravation of his medical condition is from the time it first received the November 14, 2013 notification and when it later accepted the claim on March 6, 2014.

In his deposition, Roman's treating neurologist, Dr. Michael A. Epstein, testified Roman probably would have had a better outcome had he been treated in a more timely

fashion. He testified the overall delay in treatment affected Roman, but could not say "with any degree of medical certainty" whether (1) the delay between Roman's injury and Berkshire's notification of his claim or (2) the delay between Berkshire's notification and when it later accepted the claim made more of a difference. Indeed, he testified, "I can't say which delay absolutely made the critical difference at all." Thus, the testimony of Dr. Epstein does not establish with any degree of medical certainty that Berkshire proximately caused Roman's aggravation of injury. Roman's failure to present any expert testimony to establish this causal link is fatal to his claim. *See Gentry v. Daugherity*, CV-13-02136-PHX-ESW, 2015 WL 1346097, at *3 (D. Ariz. Mar. 24, 2015) ("Unless an injury is obvious to the jury, expert medical testimony is required to establish the nature and extent of the injury as well as its relationship to the accident."); *Rasor v. Nw. Hosp., LLC*, 239 Ariz. 546, 550, 373 P.3d 563, 566 (App. 2016) ("Expert medical testimony is . . . generally required to establish proximate cause unless a causal relationship is readily apparent to the trier of fact."). Therefore, Berkshire is entitled to summary judgment on that component of damages.

Roman does not directly address the causation argument in his response. He does argue, however, that he is entitled to damages for mental anguish, pain and suffering, financial damage, and loss of enjoyment of life. *See Mendoza v. McDonald's Corp.*, 222 Ariz. 139, 149, 213 P.3d 288, 298 (App. 2009). Roman prayed for such damages in the complaint (Doc. 1, at 10-11.) and expert medical testimony is not needed to establish such damages. Accordingly, Berkshire is not entitled to summary judgment on this component of damages for lack of evidence of causation.

### B. Bad Faith

Summary judgment must be granted against Roman's bad faith claim for lack of bad faith. Bad faith arises when an insurer "intentionally denies, fails to process, or pay a claim without a reasonable basis." *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 196 Ariz. 234, 237, 995 P.2d 276, 279 (2000) (quotation omitted). The tort of bad faith has two elements: (1) that the insurer acted unreasonably toward the insured and (2) that the

insurer acted knowingly or with reckless disregard of the unreasonableness of its actions. *See id.* at 238. Unreasonable actions include failure to "immediately conduct an adequate investigation," failure to "act promptly in paying a legitimate claim," "forc[ing] an insured to go through needless adversarial hoops to achieve its rights under the policy," and "lowball[ing] claims." *Id.* An insurer may challenge claims which, after adequate investigation, are "fairly debatable." *Id.* at 237. "But . . . while fair debatability is a necessary condition to avoid a claim of bad faith, it is not always a sufficient condition." *Id.* at 238.

Roman points to three separate actions by Berkshire which he argues constitutes bad faith. First, Berkshire failed to provide equal consideration to Roman because it instructed its adjusters to target and deny claims, as opposed to honestly investigate the facts and evidence. Second, Berkshire failed to adequately investigate the claim because it delayed initiating its claims process for eight days, failed to contact Roman for 20 days, and failed to contact medical providers for 21 days. Third, Berkshire required an IME, which was not necessary for a compensability determination related to Roman's concussion and subdural hematoma. None of these arguments has merit.

### 1. Policy or Practice of Berkshire

The first argument – that Berkshire instructed its adjusters to target and deny claims – is unsupported by the record. Roman hinges this argument on a single quote within a three-page "Claims Bulletin" of the insurer, which states: "The majority of delays and investigate denials are issued to gather information needed to support a denial." As an initial matter, it is perfectly proper for an insurer to seek information to support a denial. The insured must also seek out the information that would support a claim. In any event, the quote is misleading when read in isolation. As the Bulletin explains, there are four "strategic tracks" when evaluating the compensability of a claim, including the initial "Investigate" track, which is where the quote is found. The Investigate track is used when "[t]he Claims Professional does not have enough information to make a compensability determination." The track is merely one of several

stages in evaluating a claim. As the Bulletin makes clear, additional action will always follow the completion of an investigation, including accepting a claim: "The Investigate strategic track will always result in additional action to be taken once the investigation has been completed. In some instances it will mean accepting the claim . . . ." In short, the very document on which Roman relies says all investigation will be done. Moreover, there is no evidence here that the adjuster failed to investigate or give equal consideration to all of the facts and circumstances favorable to Roman. The investigation was prompt and earnest. Berkshire sought out the evidence favorable to Roman.

### 2. Adequacy of Investigation

The second argument regarding Berkshire's investigation similarly fails because the investigation indisputably was adequate. As discussed above, neither Roman nor Roman's employer notified Berkshire of the injury he suffered on September 3, 2013. Ten weeks passed before Roman filed a worker's compensation claim with the ICA and more than another week passed before Berkshire first learned the claim. The "Notification of Claim" is a one-page document that does not include information about the nature or extent of Roman's injury, the medical treatment he received, or Roman's address or phone number.

Roman complains about the adequacy of the investigation from when Berkshire received the ICA notification and when it submitted a response on December 6, 2013. The record does not indicate when Berkshire received the notification. However, even assuming it was received on the earliest possible date, November 14, 2013, the record shows Berkshire opened a case file within seven business days, on November 22. By November 25, Berkshire assigned a claims adjuster to evaluate the claim and had attempted at least once to verify Roman's contact information.

On the same day the adjuster received the file, November 25, he started investigating the claim. He contacted the employer at least four times from November 25 to December 4 to discuss the claim and to try to obtain Roman's correct contact information. When he finally received Roman's contact information, the adjuster

promptly called Roman on December 5. In that call, Roman "did not go into specifics of the claim or his injury." As the adjuster noted, "When I asked [Roman] to provide more information about the claim and injury, he indicated that he would prefer to have an attorney speak with me; [Roman] was not willing to continue the conversation. I provided my contact information and instructed [Roman] to have his attorney contact me as soon as possible."

Neither Roman nor his attorney called the adjuster back by the next day, December 6, 2013, the deadline for Berkshire to file its notice of claim status with the ICA. However, the adjuster did reach Roman by phone again that day and learned more about Roman's injury and medical treatment he received, including phone numbers for both Wheaton and Arrowhead. Berkshire was in no way at fault for not reaching Roman earlier and not contacting the then-unknown medical providers earlier.

Roman complains that "[e]ven after Defendant finally contacted Mr. Roman, Defendant continued to delay its investigation," citing the length of time it took to receive the medical records. But on the same day the adjuster received the contact information for both Wheaton and Arrowhead, December 6, he called both facilities to request Roman's medical records and sent faxed requests as well. The Wheaton records arrived within two weeks, on December 19. The Arrowhead records arrived several weeks later, on January 30, 2014. The adjuster's efforts in the interim were far from unreasonable: between December 6, 2013, and January 24, 2014 (when Arrowhead confirmed it had processed the request), the adjuster called or faxed Arrowhead on at least six separate occasions to try to obtain the records. Berkshire is not responsible for the medical providers' delays in sending medical records despite Berkshire's repeated requests.

Moreover, on February 3, 2014, within days of receiving the Arrowhead records on January 30, 2014, the adjuster sought to schedule an IME. The IME occurred on February 27, 2014, which was prompt. Based on the IME report, which Berkshire received no earlier than March 3, 2014, Roman's claim was accepted on March 6, 2014.

In sum, the record reveals the investigation was adequate.[1]

### 3. Independent Medical Examination

Finally, Roman attacks Berkshire's decision to schedule an IME, asserting it was not necessary for making a compensability determination. An insurer is entitled to seek an independent medical examination not only to determine a claimant's need for treatment, *Mendoza*, 222 Ariz. at 159, 213 P.3d at 308, but also "to ensure further medical treatment is necessary." *Demetrulias v. Wal-Mart Stores Inc.*, 917 F. Supp. 2d 993, 1007 (D. Ariz. 2013). In addition, an insurer may reasonably schedule an IME to determine the cause and extent of an injury. *See, e.g.*, *Bronick v. State Farm Mut. Auto. Ins. Co.*, CV-11-01442-PHX-JAT, 2013 WL 3716600, at *9-12 (D. Ariz. July 15, 2013) (granting insurer's motion for summary judgment on bad faith claim even though insurer required plaintiff to attend an IME to determine the cause of plaintiff's injury).

Here the medical records gave a focused need for an IME. The Wheaton records indicate Roman went to the emergency room a few days after the fall reporting a headache that would not resolve. Roman reported a history of hypertension and not being complaint with his medications. As was later explained, the headaches Roman complained of "may . . . have been amplified by uncontrolled hypertension." The Wheaton records unclearly presented the nature of Roman's injury and were divergent in that they indicated a concussion yet concluded Roman's symptoms were "not consistent with traumatic injury." The Arrowhead records identified a subdural hematoma, which required a subdural drain to dispel the blood, but not a concussion. The Arrowhead discharge report noted Roman could return to work the next day and the notes from his

---

[1] There was no slack in Berkshire's investigation. But even if there was, that would not make a case of bad faith. *See Rawlings v. Apodaca*, 151 Ariz. 149, 157, 726 P.2d 565, 573 (1986) ("Insurance companies . . . are far from perfect. Papers get lost, telephone messages misplaced and claims ignored because paperwork was misfiled or improperly processed. Such isolated mischances may result in a claim being unpaid or delayed. None of these mistakes will ordinarily constitute a breach of the implied covenant of good faith and fair dealing, even though the company may render itself liable for at least nominal damages for breach of contract in failing to pay the claim."); *Miel v. State Farm Mut. Auto. Ins. Co.*, 185 Ariz. 104, 110, 912 P.2d 1333, 1339 (App. 1995) ("Mere mistake and inadvertence are not sufficient to establish a claim for bad faith.").

follow-up appointment stated: "Today the patient is doing well, with no symptoms, no complaints, including denies pain or any neurological deficit. The patient did not need all of his pain medicines per his report."

The medical records thus raised questions regarding the nature, cause and extent of Roman's injury. For example, the records did not establish whether or when Roman's subdural hematoma resolved; the extent to which Roman's uncontrolled hypertension played a role; whether Roman's delay in seeking treatment impacted his condition; and whether the treatment Roman received was reasonable and necessary. In light of the conflicting records and unresolved questions, the insurer reasonably sought an IME to assess the compensability of Roman's claim. Berkshire asked the IME physician to answer the following questions:

1. Please advise Mr. Roman's diagnosis from both Wheaton Franciscan Healthcare and Arrowhead Regional Medical Center. Please explain the diagnosis in relation to his method of injury.

2. Please address whether assuming there is some injury attributable to the fall on 09/03/13 his delay in seeking treatment or reporting to his employer made or makes [it] more difficult to investigate.

3. Do you feel the recommended surgical treatment was reasonable and necessary? Please explain.

4. Has Mr. Roman reached maximum medical improvement in relation to the 09/03/13 injury, and if so on what date?

5. If Mr. Roman has not reached maximum medical improvement, what type of medical treatment would you recommend?

6. Has Mr. Roman sustained any permanent impairment in relation to the 09/03/13 injury?

7. Please address work capabilities in relation to the 09/03/13 injury.

(Doc. 61, Ex. 14 at 4-6.)

Based on the assessment of the IME physician, Berkshire promptly accepted Roman's claim. Thus, contrary to Roman's characterization, the IME was not "an

- 11 -

unnecessary hoop," but rather a reasonable part of the investigation. As there is no evidence of bad faith, summary judgment on this claim will be granted.

### C. Punitive Damages

To receive punitive damages, a defendant must be liable for bad faith and "a plaintiff must prove by clear and convincing evidence that the defendant's conduct was undertaken with an evil mind." *Tritschler v. Allstate Ins. Co.*, 213 Ariz. 505, 517, 144 P.3d 519, 532 (App. 2006) (quotation omitted). As discussed above, Berkshire is not liable for bad faith; therefore, punitive damages are not available. But even if Berkshire were liable on the tort claim, there would still be an insufficient basis for punitive damages. An "evil mind" requires either that the "defendant intended to injure the plaintiff" or that the "defendant consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others." *Rawlings*, 151 Ariz. at 162, 726 P.2d at 578. Here the undisputed evidence does not allow an inference of either. Summary judgment will be granted against Roman's claim for punitive damages.

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment (Doc. 55) is granted.

IT IS FURTHER ORDERED that the Clerk enter judgment against Plaintiff on his complaint and in favor of Defendant, and that Plaintiff take nothing.

The Clerk shall terminate this case.

Dated this 6th day of September, 2017.

_____
Neil V. Wake
Senior United States District Judge